Filed 10/23/23  P. v. Sanchez CA5

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ALEJANDRO SANCHEZ,<br><br>    Defendant and Appellant. | F085622<br><br>(Super. Ct. No. CRL007281)<br><br>**OPINION** |

## <u>THE COURT</u>*

APPEAL from an order of the Superior Court of Merced County.  Mark V. Bacciarini, Judge.

Kaiya R. Pirolo, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Poochigian, Acting P. J., Detjen, J. and Snauffer, J.

## INTRODUCTION

In 2013, appellant and defendant Alejandro Sanchez (defendant) was convicted after a jury trial of premeditated attempted murder with firearm and great bodily injury enhancements, and sentenced to life with the possibility of parole.

In 2023, the trial court denied defendant's Penal Code[1] section 1172.6 petition and found he failed to make a prima facie case for resentencing.

On appeal, appellate counsel filed a brief which summarized the facts and procedural history with citations to the record, raised no issues, and asked this court to independently review the record pursuant to both *People v. Delgadillo* (2022) 14 Cal.5th 216 and *People v. Wende* (1979) 25 Cal.3d 436. Defendant submitted a supplemental brief. We address his contentions and affirm the trial court's denial of his petition.

## FACTS[2]

"In August 2011, defendant began living in Los Banos with Cynthia Ramos, his mother, and Rito Ramos, his stepfather. Rito[3] had been defendant's stepfather since defendant was six years old. Rito let defendant use a 1997 Ford Ranger pickup truck,

---

[1]    All further statutory citations are to the Penal Code.

[2]    The following facts are from this court's nonpublished opinion in *People v. Sanchez* (Jan. 22, 2016, F067089) [nonpub. opn.] (*Sanchez*), which affirmed the judgment in defendant's direct appeal. The People filed the opinion as an exhibit in opposition to defendant's petition. This court also granted defendant's request to take judicial notice of the reporter's transcript from his jury trial.

In reviewing a section 1172.6 petition, the court may rely on "the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3); *People v. Clements* (2022) 75 Cal.App.5th 276, 292; *People v. Cooper* (2022) 77 Cal.App.5th 393, 400, fn. 9.) The role of the appellate opinion is limited, however, and the court may not rely on factual summaries contained in prior appellate decisions or engage in fact finding at the prima facie stage. (*Clements*, at p. 292; *People v. Lewis* (2021) 11 Cal.5th 952, 972.) We have quoted the factual statement from defendant's direct appeal to place his current arguments in context, and will not rely on that factual statement to resolve his appeal from the trial court's order that found his petition did not state a prima facie case for relief.

[3]    "To avoid confusion, we refer to members of the Ramos family by their first names. No disrespect is intended."

2.

gave defendant his credit union debit card, and deposited $30 a week into the account for gasoline. After moving into his parents' home, defendant deposited about $1,600 in checks in the credit union account and withdrew the funds. The credit union contacted Rito because there was a problem with the checks defendant had deposited. Defendant assured Rito he had worked for the money and would straighten things out with the person who gave him the checks. Defendant said he would 'pay back the bank.'

"Rito made arrangements with the credit union to pay $200 a month. Defendant was present. Rito told defendant he was going to have to pay the money. Defendant said he would get a job. Rito arranged to start the payments to the credit union in January 2012.[4]

"Rito and Cynthia worked in the San Jose region, commuted with defendant, and usually left for work between 5:30 and 5:45 a.m. Defendant went to a trade school in Milpitas.

"Prior to leaving the home the morning of February 1, defendant and Rito got into an argument. The registration on the Ford Ranger pickup truck was coming due, the truck had to pass a smog test, and it also needed a new clutch. The expenses were too much for Rito and he told defendant he was going to sell the truck to a junkyard. Rito asked defendant for the key to the truck. Defendant became angry. Cynthia told her husband and son to stop arguing. Rito and defendant argued about Rito's plans for the truck and about the money owed to the credit union. Defendant said he had no money.

"Rito, Cynthia and defendant went outside. Rito told defendant he had to have the money owed 'tonight … so [Rito] could pay the credit union or else.' Defendant asked Rito if he was making a threat. Rito replied 'Yeah, you better have the money.' Rito closed the front door to the house. Rito turned around to face defendant, defendant pulled out a handgun and started firing it at Rito from a distance of eight to 10 feet. Rito

---

**4** "Hereafter, all dates refer to the year 2012."

was 'pinned against the door.' Rito heard seven shots. Five of the bullets hit him. Two bullets entered the front door in front of, and behind, Rito. Rito had bullet wounds to his 'pinkie,' another finger, his right side, and his back. Two bullets grazed Rito's head.[5] At one point, defendant moved forward and put the gun to Rito's head. Rito believed defendant 'ran out of bullets.'

"Defendant ran to the driver's side of the family truck and told Cynthia, 'Come on, mom. Let's go.' Cynthia removed the keys from the truck. Cynthia saw defendant run toward the south. She called the 911 operator, reported the shooting, and said she thought defendant was in the backyard. Cynthia told an investigating officer that Rito told defendant prior to the shooting that 'they could handle the situation today … [t]hat he could leave today.'

"Officers from the Los Banos Police Department responded to the 911 call. They found defendant walking on his parents' street. A .22 caliber Ruger was found in the street near the shooting and turned over to the police. The gun appeared to be scratched from the road or from a vehicle running over it. The ammunition magazine was empty, but there was one bullet in the chamber. The firing pin from the gun matched the firing pin indentation from four of the spent shell casings found at the scene of the shooting. The gun's serial number had been deliberately obliterated, something usually done to conceal the fact the weapon had been stolen. Two .22 caliber rounds were found in defendant's bedroom.

"Defendant's sister, Jessica Ramos, testified that defendant and Rito had a few talks about defendant's debt, but they did not lead to arguments. A few days before the

---

**5** "Dr. Fereydoun Azadi, a trauma surgeon, operated on Rito's bullet wounds. Azadi described four bullet wounds: to the back of Rito's head, to the upper back of the chest, to the left side of the chest, and to the left hand of the fifth finger. According to Azadi, Rito would have died if his injuries had been left untreated. Two bullet fragments were left in his body.

"Rito was hospitalized for two to three weeks. According to Rito, the doctors 'cut [him] open' from his chest cavity to his belly button. He suffered a lot of pain post-surgery."

4.

shooting there was a birthday party for defendant. Defendant was acting distant from the family and isolating himself. Defendant acted this way when he was using drugs. Jessica thought defendant may have used methamphetamine prior to the shooting. Jessica had no experience or training in recognizing when someone was under the influence of drugs, including methamphetamine. Jessica never saw defendant use methamphetamine. Jessica assumed defendant was using methamphetamine because he had been arrested for possessing it in the past. Between January 29 and February 1, defendant did not appear delusional to Jessica. He just stayed away from the family. Jessica let Rito into the house after he had been shot. Rito slumped to the floor with blood coming out of his head. Cynthia told Jessica that defendant shot Rito.

"February 1 was a Wednesday. Cynthia told Detective Anthony Parker defendant had used methamphetamine the previous Thursday or Friday. She testified at trial, however, that she told investigators she thought defendant was under the influence of methamphetamine at the time of the shooting.

"Parker was one of the investigators assigned to the shooting and had training on how people use methamphetamine. Parker had seen people under the influence of methamphetamine. On February 1, Parker observed defendant for two hours as defendant sat across a table from him after his arrest. Defendant did not appear to Parker to be under the influence of methamphetamine.

"Detective Eduardo Solis observed defendant at the police annex after his arrest. Solis had narcotics training and experience with people under the influence of methamphetamine. People using methamphetamine often neglect eating and are paranoid. Defendant was nervous about his circumstances, but his demeanor was otherwise calm. Defendant was cooperative and answered questions. Defendant exhibited no symptoms of being under the influence of methamphetamine.

"Officer Danny O'Day assisted with defendant's arrest and continued to observe defendant after he was brought to the detention facility to determine, among other things,

whether he was under the influence of narcotics or severely depressed. O'Day had experience with individuals under the influence of methamphetamine and described outward symptoms such as eyelid flutter, dilated pupils, muscle rigidity like a clenched jaw, sweating, and being fidgety. When cooperative, people under the influence of methamphetamine can interact 'in a rapid fashion.' They can also be 'argumentative … [and] boisterous.' O'Day observed defendant continuously in the detention facility for about four hours. O'Day saw no indication defendant was under the influence of methamphetamine.

"Cynthia testified defendant cut her face with a box cutter but could not remember the exact date. Defendant was on methamphetamine. She woke him up. She then went to wash clothes. Defendant went into the kitchen and cut her. The wound required stitches and Cynthia sustained a scar from her mouth to her upper cheek bone." (*Sanchez, supra*, F067089.)

## PROCEDURAL BACKGROUND

### The Charges

On February 1, 2013, a first amended information was filed in the Superior Court of Merced County charging defendant with count 1, premeditated attempted murder of Rito (§§ 187, subd. (a)/664, subd. (a), 189), and that he personally and intentionally discharged a firearm and proximately caused great bodily injury (§ 12022.53, subd. (d)), and personally inflicted great bodily injury on the victim (§ 12022.7, subd. (a)), with prior conviction allegations.

### Trial and Instructions

At defendant's jury trial, the court gave CALCRIM No. 600 on the elements of attempted murder: that the defendant took at least one direct but ineffective step toward killing another person, and the defendant intended to kill that person. CALCRIM No. 601 defined the attached allegation: "The defendant acted *willfully* if he intended to kill when he acted. The defendant *deliberated* if he carefully weighed the considerations

6.

for and against his choice and, knowing the consequences, decided to kill. The defendant *premeditated* if he decided to kill before acting…."

CALCRIM No. 3160 defined the great bodily injury enhancement: "If you find the defendant guilty of the crime charged in [c]ount 1, you must then decide whether the People have proved the additional allegation that the defendant personally inflicted great bodily injury on Rito Ramos during the commission of that crime. [¶] *Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. [¶] The defendant must have applied substantial force to Rito Ramos. If that force could not have caused or contributed to the great bodily injury, then it was not substantial…."

The jury was not instructed on the felony-murder rule, the natural and probable consequences doctrine, principals and accomplices, aiders and abettors, conspiracy, or any theory of imputed malice.

## Verdict and Sentence

On February 14, 2013, defendant was convicted of premeditated attempted murder, with the enhancements that he personally inflicted great bodily injury, and personally and intentionally discharged a firearm causing great bodily injury to the victim.

On April 9, 2013, defendant was sentenced to life with the possibility of parole with the minimum parole date of seven years, doubled to 14 years as the second strike term, for premeditated attempted murder; plus consecutive terms of 25 years to life for the firearm enhancement and one year for a prior prison term enhancement.

## Direct Appeal

On January 22, 2016, this court filed the nonpublished opinion in defendant's direct appeal that rejected his claims of evidentiary and instructional errors, corrected the abstract of judgment, and otherwise affirmed the judgment. (*Sanchez*, *supra*, F067089.)

7.

**PETITION FOR RESENTENCING**

On March 4, 2022, defendant filed a petition for resentencing and requested appointment of counsel.

Defendant filed a supporting declaration that consisted of a preprinted form where he checked boxes that he was eligible for resentencing because (1) a complaint, information, or indictment was filed that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine; (2) he was convicted of murder, attempted murder, or manslaughter following a trial, or accepted a plea offer in lieu of a trial in which he could have been convicted of murder or attempted murder; and (3) he could not presently be convicted of murder or attempted murder because of changes made to sections 188 and 189, effective January 1, 2019.

The court appointed counsel to represent defendant.

**The People's Opposition**

The prosecution filed opposition, and argued the record of conviction showed defendant was ineligible for resentencing because he was the actual shooter.

**The Trial Court's Denial of the Petition**

On January 13, 2023, Judge Bacciarini, who presided over defendant's jury trial, held a hearing on defendant's petition. Defense counsel stated that defendant felt "strongly" that he was eligible for resentencing and should receive an evidentiary hearing. The prosecutor argued the record of conviction showed defendant was the "actual shooter."

The trial court held defendant failed to state a prima facie case for resentencing because he was "the actual shooter." Defendant addressed the court and stated, "I never had a weapon, so I mean the district attorney and the People say they put a weapon in my

8.

hand. That's what I'm trying to prove right now, your Honor." The court again found he was the actual shooter and denied the petition.

On January 17, 2023, defendant filed a timely notice of appeal.

## DISCUSSION

As explained above, appellate counsel filed a brief with this court pursuant to *Wende* and *Delgadillo*. The brief also included counsel's declaration that appellant was advised he could file his own brief with this court.

In response to this court's order, appellant filed a supplemental brief and raises issues regarding his trial and conviction, and the court's denial of his petition for resentencing.

## A. Defendant's Arguments About His Trial

Defendant argues he was erroneously convicted of attempted murder based on evidence illegally seized without a warrant in violation of the Fourth Amendment because the Merced County Sheriff's Department seized a firearm that had been "abandoned in the streets and collected by the cousin of an active duty officer …." Defendant asserts the bullets were also illegally seized, there was no evidence to connect the firearm or bullets to him, there were problems with the firearm's chain of custody, and the weapon was damaged. Defendant further asserts his conviction is not supported by substantial evidence.

Defendant's claims based on his jury trial and conviction are not cognizable in this appeal. "The mere filing of a section [1172.6] petition does not afford the petitioner a new opportunity to raise claims of trial error or attack the sufficiency of the evidence supporting the jury's findings. To the contrary, '[n]othing in the language of section [1172.6] suggests it was intended to provide redress for allegedly erroneous prior factfinding.… The purpose of section [1172.6] is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved.' " (*People v.*

9.

*Farfan* (2021) 71 Cal.App.5th 942, 947; *People v. DeHuff* (2021) 63 Cal.App.5th 428, 438.)

**B. Defendant's Arguments About His Petition**

Defendant argues his petition was improperly denied because the prosecution argued, and the trial court agreed, that defendant " 'was the actual killer,' " even though no one died and he was only convicted of attempted murder. To the contrary, the record shows that at the hearing on the petition, the prosecution argued defendant was ineligible because he was "the actual shooter," and the trial court similarly found he was the "actual shooter" when it denied the petition.

Defendant contends his attorney was prejudicially ineffective for failing to raise certain issues in this section 1172.6 proceeding, including the alleged warrantless seizure of the firearm and other trial issues. As we have explained, a section 1172.6 petition does not permit a petitioner to raise claims of trial error or attack the sufficiency of the evidence. (*People v. Farfan*, *supra*, 71 Cal.App.5th at p. 947.) Defendant's attorney was not ineffective for failing to raise meritless objections or motions. (*People v. Lucero* (2000) 23 Cal.4th 692, 732.)

As for the trial court's denial of defendant's petition, "[t]he record of conviction will necessarily inform the trial court's prima facie inquiry under section [1172.6], allowing the court to distinguish petitions with potential merit from those that are clearly meritless." (*People v. Lewis*, *supra*, 11 Cal.5th at p. 971.) The record of conviction includes the jury instructions. (*People v. Williams* (2022) 86 Cal.App.5th 1244, 1251–1252; *People v. Offley* (2020) 48 Cal.App.5th 588, 599; *People v. Harden* (2022) 81 Cal.App.5th 45, 50, 54–55.)

The jury was correctly instructed on the elements of attempted murder. "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623; *People v. Perez* (2010) 50 Cal.4th 222, 224.) The instructions establish

that defendant was convicted as the actual shooter who acted with the intent to kill, and the jury was not instructed on the natural and probable consequences doctrine, aiding and abetting, or any theory of imputed malice.

## DISPOSITION

The court's order of January 13, 2023, denying defendant's section 1172.6 petition for resentencing, is affirmed.